May it please the Court, my name is David D'Alessandro. I represent Petitioner, Nebraska Public Power District, also known as MPBD in this proceeding. In 2009, MPBD and two other Nebraska utilities joined the Southwest Power Pool, which is known as SPP. And the 16, 17, the MPBD zone, and 18, coupled with SPP's existing license plate rate structure, ensured there'd be no cost shifting between these three entities. And at the same point in time in 2009, Tri-State did not join SPP and continued operating its transmission facilities in Western Nebraska pursuant to its own tariff and pursuant to the Western Nebraska Joint Transmission Agreement, known as the NETS Agreement in this proceeding. And there's no dispute in the orders under review that when Tri-State decided to join SPP in 2016, and the placement of Tri-State in MPBD's zone 17 resulted in a $3.5 million cost shift in rate increases of 6 to 8 percent to MPBD and the other customers in zone 17. Are the amounts of rate increase in dispute or is that a non-disputed fact? There's no dispute, at least with the respondent, that the rate increases would be 6 percent over a 10-year period on average when you take into account the known and measurable changes. I believe Tri-State would have an additional adjustment they'd like to make to that, but the commission did not accept that adjustment in their order under review. So that's why I referred to there's no dispute in the orders under review about the size of that rate increase, 6 percent. Now as I understand it, this is not a rate proceeding like the Illinois Commerce Commission. This is an approval of SPPD's plan to choose the zone. Yes, and their choice On that basis, on page 104 of the addendum in the middle of the FERC opinion, the agency says, although cost shifts are an important consideration in determining a just and reasonable zone placement, it should not be the only consideration, as NPPD suggests. All facts and circumstances should be considered. That strikes me as incontestably right. Well, Your Honor, all things should be considered, but the cost shift is the starting point, and even though this is not a No, it's not the starting point. The starting point is a lot more than that. What are we, if we were to agree with you on the cost-causing issue, what's next? We're supposed to order FERC to order SPPD to put TS in zone 19? Well, that would be reasonable because it would No, it's not reasonable for us. That's not our job. Our job is to approve or not approve the zonal placement decision. Well, what FERC found in this case, Your Honor, is that the $3.5 million cost shift was accompanied by commensurate benefits, and it's that finding that we believe is not supported by substantial evidence. There are four factors they recite, and I thought the cost is the fourth. No, Your Honor. Operating efficiencies and everything else is at least of equal significance, and you don't even question those. Apparently, you settled the rate issue separately and left yourselves to fight the rate case in this proceeding, and I think that seems to me that was a tactical mistake. No, what we settled, Your Honor, was the amount of revenue that Tri-State was entitled to as a transmission owner, but we did not settle. We expressly reserved the issue of whether rolling in that revenue requirement that we settled resulted in an unjust and unreasonable cost shift. Well, that should have been in the rate. This is zonal placement. If under all the circumstances, zone 17 is the right place for Tri-State, what's next? Well, it's the right place for Tri-State because they receive... Answer the question, please. If we just do the narrow issue before us and conclude that there's substantial evidence supporting FERC's decision that zone 17 is a not unjust and unreasonable placement, what's next? Well, then you would be affirming that decision, and we would remain with Tri-State in zone 17. Yeah, you'd go to the next rate proceeding. You'd say, now we want to challenge SPPD's application of what the briefs refer to as the license plate methodology to this new zone 17, right? No, Your Honor. This would be the end of it because the license plate rate methodology is in place in SPP, and if we were to challenge that structure in the future, any relief from that would be under section 206 of the Federal Power Act, prospective only, and we would have no relief back to 2016. But wait a minute. Illinois, Judge Posner says that Illinois Commerce was a proceeding to challenge the rate design of the RTO. Yes. You're just telling me SPPD's rate design is locked in stone if we affirm. How can that be? Well, the rate design is in place, and we had no control over that. It was already just and reasonable when we joined. It was in place. But now you say it isn't. Now you've got a new member. Yes. And you tell FERC they've got to rethink their approval of the rate design. No, we were saying the FERC, whenever a new transmission owner is being brought into the Southwest Power Pole, there needs to be an analysis of the relative cost shift that would take place. Well, there was. Well, there was no analysis. How many pages in their 100-page opinion were devoted to the cost shift issue? Well, there was a lot of pages devoted to the cost shift issue in Zone 17, but FERC rejected MPPD's evidence demonstrating that if Tri-State was placed in Zone 19, there would be no cost shift to Tri-State. Is that the core of this appeal, then? The choice between 17 and 19? That's not the way it's briefed, but although that's in there. That's the second point we made, Your Honor, that substantial evidence, to be substantial, needs to take into account whatever's in the record that detracts from its weight. And FERC ignored that evidence. And we're saying within the context of a license plate rate design, it is very relevant to look at the relative cost shift that takes place between two eligible zones. You have to appreciate that Tri-State could have been placed in either Zone 17 or Zone 19. In fact, when Tri-State decided to join SPP, you know what the first thing they did? They went to SPP and asked them to analyze which zone would give us the maximum benefit. That's like saying, which zone would allow us to shift the maximum amount of cost to other people? And SPP responded by saying Zone 17. I suspect their stockholders would have applauded that. Well, they're a publicly owned cooperative. Oh, all right. But the customers. They're members. There's no question that members were standing up and cheering because they managed to shop for a subsidy and get it. And it's not just and reasonable. That's why we're here. Do you deny that NPPD is used and benefited from Tri-State's facilities? No. We recognize that there are benefits in terms of joint planning and joint use. And we had a witness testifying that those benefits are measured by the annual equalization payment. So then how can it be inconsistent with cost causation to have NPPD and its customers pay for that use? Because it's all in terms of there are some benefits. And like an Illinois Commerce Commission, the Third and Seventh Circuit said, yes, there are some benefits. But the important question is how much benefits and whether those benefits are spread equally over all customers. And the annual equalization payment in the NETS agreement demonstrates that Tri-State was the net beneficiary of this joint use and joint planning. And they had to pay NPPD a million dollars a year. And the other thing, Your Honor, is Tri-State proposed a modification to that formula to change the usage-based component of that calculation. And even under Tri-State's preferred method of measuring benefits, the $3.5 million annual cost shift was six times more than the $550,000 of benefits measured under Tri-State's methodology. So that's the important point. It's relativity. And if you look at the Seventh Circuit opinion, it's how much the costs are. Does FERC take into account non-financial benefits and shifts of costs that they can take into things that don't involve transfers of money? Yes. Those benefits were all considered, and FERC made rulings on the cost shift as being accompanied by commensurate benefits. And we demonstrated that the substantial evidence did not support that finding, that the benefits were measured by $550,000. That, in essence, is what we are called upon to resolve, is whether that substantial evidence supports the decision that the benefits are sufficiently balanced. Yes. Benefits and costs. And if I can get back to your question about financial and non-financial benefits, the benefits all listed in the NETS agreement include financial and non-financial benefits. And the annual equalization payment in that NETS agreement is designed to provide compensation for the NET beneficiary of all those benefits. It's not just financial benefits. Although the payment is financial, but the benefits being addressed are all the benefits under that agreement, including reliability, joint use, joint planning, the avoidance of the cost of constructing duplicative facilities. And FERC, at least respondent in their brief, claims that that annual equalization payment addressed only usage-related benefits, and that would be, you know, the financial benefits. And FERC never made that holding. We would ask you to ignore those claims as post hoc rationalization of counsel. FERC said in their brief? Did you mean Tri-State said in its brief? FERC. Did I say Tri-State? No, you said FERC claimed in their brief. Yes, FERC claimed in their brief at pages 33 and 38. Where's FERC? FERC's the decision maker. Respondent counsel for FERC. I'm sorry, Your Honor. Counsel's brief. Staff did not favor the agency decision, right? No, the FERC staff agreed with MPPD that there was a cost. Their staff brief doesn't make much difference. I'm sorry, Your Honor. I was referring to respondent's brief that filed in the court with you. Yeah, you said FERC's brief. I thought you must mean respondent's. I meant respondent. I said FERC, and I'm clarifying it. It's respondent. What was the point again? The point is that respondent claims that the annual equalization payment, this is at pages 33 to 38, addresses only usage-related benefits. And FERC never made that holding. And that holding is post hoc rationalization of counsel. FERC never held that the annual utilization payment compensated only or addressed only usage-related. What FERC said was the annual equalization payment is just one measure of the relative benefits that the parties receive under the NETS agreement. And they went on to say that MPPD provided no reason why the alternate methodology proposed by Tri-State for measuring benefits isn't appropriate. But FERC never said that the So has Tri-State ever been compensated by MPPD for the use of its facilities? Well, the agreement that they have governing joint use requires each party to pay for the cost of each facility. And the party receiving the greater benefits has to pay the other party for the greater use. And in all the years that that agreement was in place for the last 30 years, Tri-State was the net beneficiary under the formula for measuring benefits. It had to pay MPPD about $1.1 million a year. So MPPD never paid Tri-State for that. But it's, Your Honor, it's a NET calculation. The formula calculates the benefits that each party receives. So each party is receiving some benefits. But those are compared Historically, Tri-State paid it, right? Yes. On a NET basis? Yes. And what is it paying for? Is it paying for its use of MPPD's facilities? It's paying for the greater use that Tri-State made of the MPPD facilities and the greater cost that MPPD invested. Because the formula requires the percent usage that each party makes of the total. Is that legacy cost? Yes. Multiplied by the other party's cost invested. So if one party invested more cost than the other, and even if the use was 50-50, the party that invested less money would pay the other party. So it's more than a use base. It's a cost-based formula as well. If I could save my time for rebuttal, but I don't want to stop answering any questions, but I have three minutes left for rebuttal. Certainly. You may reserve your time. Thank you. Thank you, Mr. D'Alessandro. You're welcome, Your Honor. Mr. Estes. May it please the Court. I'm Matt Estes, appearing on behalf of the Federal Energy Regulatory Commission. And I guess to clear up any confusion, Judge Loken, the commission is a party to this appeal and is defending its order here before you. Your Honors. Well, okay. Your Honors, Tri-State and the Nebraska District have operated their transportation transmission jointly for over 35 years since 1984. And after conducting an evidentiary hearing. Counsel, could you speak a little closer to the mic? Yes, I'm sorry, Your Honor. After conducting an evidentiary hearing before an administrative law judge, the commission found, based on record evidence, the following facts about that arrangement. First, they found that the parties' facilities are operated in a highly integrated manner, used to serve the customers of both parties, and treated operationally as if it were a single system owned by a single owner. Second, the commission found that there are more interconnections between Tri-State and Zone 17 than there are with any other southwest zones. So what's the connection between those non-monetary considerations and the issues that are raised by the appellant? Well, Your Honor, we disagree with Mr. D'Alessandro's view that the non-monetary considerations are quantified by this equalization payment, this monetary payment in the agreement. In fact, there were, the commission described, and I think there are several pages and paragraphs. Can you give us the page numbers that you're referring to? It's a fairly long opinion. Yes. It starts at paragraph 192, which is, that's page 97 of the Petitioner's Addendum. And there's a long description from paragraphs 192 through 195, which runs through page 100. And then again, starting at paragraph 205, which begins at page 105 of the Petitioner's Addendum. And from there really to the end of that section, which is paragraph 208, which is on page 107 of the Addendum. And in there, the commission describes, I think in significant detail, these non-monetary benefits. I think one important one that the commission mentioned several times is the ability to avoid the duplication of facilities. And that's important because in Nebraska and the rural areas, if each company had to build facilities to serve its own loads, there could be significant additional facilities constructed. So what would be the non-monetary considerations for placement in Zone 19 instead of 17? Your Honor, I'm not aware that there really were any non-monetary considerations there. The main consideration advanced by the Nebraska District was just – Doesn't 19 include the basin part of the basin group that TS had arrangements with before? Yes. It is true that Tri-State arranged for transmission from a basin located in Zone 19. But it's not integrated in any significant fashion with that company. And there aren't any costs of the basin facilities – or there's no use made of the basin facilities by Tri-State other than arranging for transmission service, which they pay for under the relevant tariffs. Which is different than here because here the Nebraska District is able to use Tri-State's facilities without making any payment whatsoever. Let me come back to where I was with opposing counsel kind of at the beginning. If we uphold the placement of TS in Zone 17, and with what's called the license plate rate regime in place and not challenged presently, and let's suppose that the future reductions in the cost shift that the briefs talk about, what, 4.3 to 3 – you know, suppose those don't materialize and that one or more members of Zone 17 think that now the longstanding license plate rate regime is out of whack, unjust, and unreasonable. What is FERC's authority to do something about that? At that point, those parties could file a complaint at the Commission under Section 206 of the Federal Power Act. And if the Commission agreed with them that it no longer was just and reasonable to roll in those costs, then the Commission could change that. Then SPD would have to do something or would be ordered to do something about that within the confines of Zone 17. Yes, that's correct, Your Honor. And is that the kind – was it a 206 proceeding that was settled? No. It seems like a preamble to today. No, that was – again, that was a rate filing under Section 205 that was settled. So that set the costs. But a 206 is a challenge to a rate established under 205? Yes, that's correct, Your Honor. And what was Illinois Commerce Commission? Was that a 205 or 206 proceeding? Your Honor, I have to confess I don't know the answer to that. I'm out of my league, and we know it's not that important. But I think you did – your description of the difference between the Illinois Commission cases and these cases, it does raise an important point, which is here, the allocation is an all-or-nothing allocation. If the Nebraska District were to prevail and be placed in a different zone, then none of the costs of the tri-state facilities would be allocated to the Nebraska District, even though it's clear that they benefit from those facilities. Tell me why the equalization payment doesn't account for the use of each other's facilities on a net basis. No, it does account for the use of each other's facilities. But what it doesn't really account for is benefits such as the avoidance of construction of new facilities. All that that calculation does is determine who's making greater use of the joint facilities, and it requires a payment then based on the operating costs of those facilities. So is the only benefit that we're looking at is the avoidance of creating duplicative facilities? The only non-quantified benefit – I don't know that it's the only one. The Commission refers to other benefits such as joint planning and joint operations. I don't think those are as high. I think the avoidance of the duplication of facilities is the one with the greatest dollar value. But no attempt to quantify that dollar value? No, there wasn't, Your Honor. I think the Commission explained at paragraph 207 of its order why that wasn't really possible. That's page 106 of the petitioner's addendum. They said the problem was that because these facilities have been planned and operated jointly for over 30 years, it's really difficult to unscramble the egg of those joint operations and to figure out exactly what would have been constructed if, in fact, the Nebraska District had to build its own facilities to serve its own customers. And the Commission pointed out that the Nebraska District agreed that it did require the use of some of Tri-State's facilities to serve its own customers. So this is not just some general principle. It was based on the specific evidence in the record that, in fact, these benefits were accruing to the Nebraska District. I'd like to respond, if I could, to the point that Mr. D'Alessandro made at the end of his argument that somehow the Commission did not find in its orders that the equalization payments quantified all the benefits of operations. I think that reading is just simply not consistent with the reading in the Commission's orders. If you look at paragraph 195, which is the paragraph that the Nebraska District relies on, in that paragraph the Commission says the annual equalization payment is just one measure of the relevant benefits. And if you look at the Commission's order on rehearing. And what part of 195 is that? I believe it's the second sentence. Let me turn back to there. Okay. Thank you. If you go to paragraph 24 of the Commission's rehearing order,  at the very beginning of that paragraph the Commission says, we disagree with the Nebraska District's interpretation of the relevance of the equalization payments. The Commission reiterates its holding from its opinion 562 that that is just one measure of the relative benefits. The parties agreed. And then the Commission goes on to say that there's no reason that the Commission should be restricted to this measure for the purpose of deciding whether SPP's proposal is consistent with cost causation principles. Now, Mr. D'Alessandro argues that all that the Commission was saying here is, no, the equalization payment is okay, but you should have performed it using a different metric of the party's relative use of the systems. But I don't think that's a fair reading of what the Commission said. If the Commission had done that, then they would have concluded that if only the opposing method for doing the calculation were performed, then there would be rough, that that would equal rough equalization. But that's not what the Commission held. Instead, what the Commission held is that examining these two different metrics demonstrates that both Tri-State and the Nebraska District benefit from these facilities. And that conclusion, Your Honors, is reached at the end of a four-page discussion of all the benefits that both parties obtain from the joint operation of their facilities. And this is just one more reason to conclude that both parties benefited. What the four pages are, right? The ones right before that. It's paragraphs 192 through 194, pages 97 through 99. And then, Your Honors, after making this finding that both parties benefit, the next three paragraphs from pages 100 to 101 describe the cost causation principles that the Commission follows. And the basic point there is when a party causes costs to be incurred, then it's appropriate to allocate costs to that party. And the Commission's finding that no, Tri-State is not the only beneficiary of this arrangement, which is what the equalization payment would suggest. They both benefit, and under cost causation principles, it's appropriate to allocate the costs to both parties. Is there anything in the record about the net financial advantage or disadvantage to NPPD if TS becomes a member of Zone 17 in the pool? Well, the record shows that its costs would go up. There's some dispute among the parties over exactly how much, but the Commission agreed that one way to look at it was that it would average $3.5 million over a 10-year period. Is there any offsetting financial advantage to this? Well, it's a continuation. It's the integration with Tri-State under a different regime. Yes. Well, I would say the record is there is an offsetting advantage. It's not quantified, but the advantage is they get to use Tri-State's relatively more expensive facilities for free, which is what they got to do for over 30 years. The only payments ever made between the companies were from Tri-State to Nebraska District, but notwithstanding that, the Nebraska District used Tri-State's facilities to serve its customers. Does that mean they used them for free, though, if it was netted out, if the equalization payment nets out? The equalization payment doesn't net out those payments. It does call for a payment among the parties if one has greater usage than the other, but it's not a netting out of all the costs. Your Honor, I'd like to just briefly discuss, I think, important factual differences between this case and the Illinois Commission cases that the Nebraska District relies on. Those cases involved the allocation of the costs of transmission lines that were located hundreds of miles away from the utilities being allocated the costs, and notwithstanding this distance and notwithstanding that those utilities did not use the transmission lines, they were allocated significant amounts of the costs of those lines. I think the record showed that for one line in New Jersey, the utility in Chicago was allocated a greater percentage of the cost of that line than the two utilities in New Jersey. And it was in that context of no apparent use and significant allocations that the Seventh Circuit insisted that the Commission provide more than a general explanation of the benefits. I think here where the two utilities are not hundreds of miles away but operate as a single integrated system, that the standards that the Seventh Circuit said are easily satisfied here because the hard evidence, not a general review, shows benefits to the Nebraska District. I see my time's up, and unless there are any more questions, I'm through. Thank you, Mr. Justice. Mr. D'Alessandro, your rebuttal? Actually, I guess we have an intervener. Yes, Your Honor. Mr. Friedman. Thank you, Your Honor. I'm not sure how you want to proceed, Mr. Douglas. I don't have much to do with rebuttal now. I'll leave that to the panel. Otherwise, I'm prepared to. Well, I think it would be appropriate for you to go ahead, and then he can reply to you as well. Thank you. May it please the Court, I'm Larry Friedman, and I'm representing the intervening respondent, Tri-State. And we agree with the commission that the petition for review should be denied. I just want to, separately on behalf of Tri-State, just emphasize a couple of points. This is about a regulatory proceeding which involved the decision of where to place transmission facilities in a multistate regional transmission organization that covers a very large 546-square-mile area. It's been a three-and-a-half-year regulatory proceeding. There were 117 approximately exhibits in the proceeding below. The commission conducted a very thorough review. And the petition for review ought to be denied because there is substantial evidence. Now, on behalf of Tri-State, I just want to emphasize, and I think Judge Loken alluded to this in some of his questions, that the cost shift issue is only one aspect of the commission's determination. And NPPD wants to ignore the criteria that the commission applied and that are discussed in its decision. And those had to do with whether the level of the annual transmission revenue requirement criteria, the geographic footprint criteria, the commission looked at that. And finally, the factors about the integration of the systems and the extent to which the new facilities are embedded in the zone that SPP selected. Mr. D'Alessandro said that Tri-State asked SPP for placement amounts in the different zones. But that doesn't mean that SPP decided to put Tri-State in Zone 17 to placate Tri-State. There was evidence in the record SPP specifically denied that in its testimony and its briefs. The other, there was substantial evidence about the benefits, and we've talked about them in your questions of the other counsel. It is clear that those benefits were legitimate factors for the commission to consider. Your time is short. Let me add, what could the commission have done with regard to zone placement other than disapprove 17? Could they have affirmatively ordered SPP to put Tri-State in 19 or in its own zone? The commission's role here was to decide whether the placement in Zone 17 was just and reasonable. And that's what it did. Wait a minute. That's fine. That's not even a good duck. I'm asking about, there must be a lot of zone placement proceedings in this complex power world. What has the commission remedially said it can do? Could it order in this proceeding to, could it order it be placed in 19? Alexandro said we should order the commission to order SPP to put them in 19. Is that something even the commission could do? No, Your Honor. And they addressed that in their ruling on the re-hearing. The answer is no. The petition for review is whether the commission's decision upholding the placement in 17 was just and reasonable. And it either is or it isn't, and they don't have the authority. What's likely to be next if we were to reverse this ruling? You would go back to the commission and presumably- You being who? SPP? Yes. Well, the proceeding, if you uphold the petition for review, it would go back before the commission, which would then have additional proceedings and theoretically provide more specificity about the quantifying of the benefits that they've already found. I don't think that's necessary because I think they are fully addressed in the commission's decision, but that's what would be the effect of- I suppose they did all the quantifying they could, and the Seventh Circuit said not good enough. This approval is disapproved. Now what's likely to be next? Is the commission going to tell SPP, well, here are additional conditions on which we would again approve 17? Or are they likely to say it's got to be 19 or new, it's never going to be 17? Or is all of that up in the air and open? That's a difficult question for me to answer. Those of us who are not with an administrative agency but have done a lot of ad law litigation get into things like that. If the petition for review were to be granted, it would go back before the commission. Would the commission have the authority to order SPP to put tri-state in 19? I don't believe they would, but what the commission would do, I wouldn't want to speculate. But the commission presumably- Are there any- I mean, in the Illinois Commerce Commission, it took them three tries, but they satisfied the Seventh Circuit on the analytic of the quantification. Yes. Has there ever been a case where the commission was reversed and couldn't satisfy and therefore had a start over in effect? I'm not aware of one, Your Honor. I don't believe there has been. I can't give you definitive answer, but I don't believe there has been. If there has been, NPP probably would have cited it to the court. I don't believe there has been. I know my time has expired. If the court has any other questions, I'll be happy to answer them. On behalf of tri-state, I ask that the petition for review be denied. Thank you, Mr. Friedman. Mr. D'Alessandro. Thank you, Your Honor. Just to follow up on the question and answering that just occurred, it's clear that what's before FERC in this case is whether the proposal to place tri-state in Zone 17 is just and reasonable. And it's our position that it's unjust and unreasonable. And it's also our position that FERC needed to look at the evidence of what would happen if they placed tri-state in Zone 19. Let me stop because the way you just said that is I thought most of this was they didn't do a good enough job of weighing the cost causation factor. But now you say the issue is up or down placement of 17. Well, that's the issue before FERC. The issue before this court right now is whether FERC had substantial evidence to support their finding that the $3.5 million cost shift was accompanied by commensurate benefits. And we're saying that there's no evidence that supports that because the benefits as measured by tri-states... Okay, but then are you saying on this record establishes that they could never be quantified? No. What we're saying is... Therefore, Zone 17 is out of it. What we're saying, Your Honor, is that under the Seventh Circuit precedent, FERC has to make some effort at quantifying the other benefits. And FERC made no effort to do that in this case. These are non-financial benefits. They made no effort to... Is that all you're asking us to review now? Not placement in 17, but that the justification for approving 17 was not sufficiently explained? We're asking you to review... There's a tremendous difference in those two. We're asking you to review the evidence that FERC relied upon to conclude that the benefits were commensurate. Because under the Illinois Commerce Commission precedent, there's no dispute that... Okay, but then it just went back for a retry, and then a second retry, and then an approval. Well, in Illinois Commerce Commission... Is that the process you want here? Or do you want, on this record, up or down on Zone 17? We think, Your Honor, that as much as we'd like you to go up or down, that the solution here is remand for two reasons. Number one, FERC is relying upon arguments here which are post hoc rationale. The argument that the annual equalization payment relates only to usage-related benefits. And it's our position that it relates to all benefits that are identified in the NETS agreement. And no party took the position in the case below that the annual equalization payment related only to non-usage-related benefits. And our witness testified that that payment compensated for joint planning and usage benefits. And no one objected to that. So it's only post hoc rationale of counsel on that issue alone. So that by itself requires a remand. And the other point that we have requiring a remand is that the quantified benefits, even under the metric proposed by Tri-State, are $550,000 to MPPD. That's the measured benefits that Illinois Commerce Commission said there needs to be an effort at quantifying benefits. And the costs that are allocated to MPPD are six times those benefits. And FERC concluded that, well, the cost could be greater than that amount. But they never made an effort to quantify how much greater. And that's the other issue that we believe requires a remand. Because the Seventh Circuit precedent clearly requires FERC to make some effort to quantify the other benefits in the record that FERC merely presumed would be enough to offset the large imbalance between allocated costs and quantified benefits. Thank you, Mr. D'Alessandro. Thank you, Your Honor. The Court appreciates all counsel's presence this morning before the Court and the argument that you've provided to us, the briefing that's been submitted. We will take the case under advisement. Thank you. Madam Clerk, would you call Case No. 2 for the morning, please? Yes, Your Honor. Cornell McKay v. City of St. Louis et al.